# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**BETTY PETERSON,**

                    **Plaintiff,**

**-vs-**                                          **Case No.  6:05-cv-690-Orl-DAB**

**JO ANNE B. BARNHART, Commissioner**
**of Social Security,**

                    **Defendant.**
_____

## MEMORANDUM OPINION AND ORDER

This cause came on for consideration without oral argument on review of the Commissioner's decision on Plaintiff's application for Social Security disability benefits. The Court has reviewed the record, the briefs and the applicable law. For the reasons set forth herein, the decision of the Commissioner is hereby **AFFIRMED.**

### PROCEDURAL HISTORY

On September 1, 2000, Plaintiff filed an application for a period of disability, disability insurance benefits and supplemental security income (R. 79-81, 394-97). The claim was denied initially and upon reconsideration, and Plaintiff requested and received a hearing before an administrative law judge ("the ALJ") (R.40-46, 398-407, 482-97). On February 10, 2003, an unfavorable decision was issued finding Plaintiff not disabled (R. 50-58).

Plaintiff requested and received review from the Appeals Council[1] (R. 73-76), and a supplemental hearing was held before the ALJ on July 30, 2003 (R. 498- 513). The ALJ issued a

---

[1]The Court notes that the Commissioner erroneously refers to this body as the Appeals Counsel (Doc. No. 15, at 1).

second decision on October 27, 2003, finding Plaintiff not disabled (R. 13-26).  Plaintiff filed a

request for review of that determination, which was denied on March 7, 2005 (R. 9-12), making the

October 2003 decision the final decision of the Commissioner.  This action followed (Doc. No. 1).

### NATURE OF DISABILITY CLAIM

Plaintiff claims onset of disability, as of April 15, 2000, based on the following: "right hand

& arm and whole left side from toe to hip has nerve damage from electricution [sic], fibromyalgia,

[and] neck injury" which causes "severe pain in neck, back and left foot." (R. 88).

*Summary of the Evidence Before the ALJ*

At the time of the decision, Plaintiff was forty four years old, with a high school education,

and past relevant work experience as a certified nursing assistant (R. 83, 89,94).

The medical record is detailed in the ALJ's decision.  By way of summary, the ALJ concluded

that Plaintiff has fibromyalgia, right ulnar neuritis, left L5-S1 radiculitis and an affective disorder (R.

18).

On September 29, 1997, Plaintiff presented to Yong H. Tsai, M.D., with complaints of  pain

and poor sleep, fatigue, numbness and constipation (R. 117).  The assessment was fibromyalgia,

medication was prescribed, as was a plan for stretching and aerobic exercise, and Plaintiff was

instructed to practice meditation to reduce stress.  It appears that Plaintiff did not return to Dr. Tsai

until September 2, 1999 and October 27, 1999, with no specific treatment notes presented (R. 113-14).

Plaintiff was seen by K. Parveen, M.D., on February 24, 1998, with nonspecific aches and pain

all over (R. 193).  Assessment was history of fibromyalgia, and Plaintiff was instructed to continue

with Aleve.  On August 16, 1999, over a year later, she returned with complaints of pain in her neck

and back after being involved in a motor vehicle accident (R. 193). Examination was negative except

-2-

for minor muscle spasms and reported pain.  The assessment was myalgia and history of fibromyalgia/Sjogrens syndrome.  Plaintiff was instructed to rest, and was placed off work for one week. *Id.*

In September 1999, Plaintiff presented to a chiropractor for complaints of headaches, neck pain, neck stiffness, radicular pain into the left arm, pain in the upper thoracic spine, low back pain and reported difficulty in grasping objects with her hands (R. 134-38).  Anterior to posterior radiographs of the thoracic spine were  without abnormal findings, save for a listing to the right from T3-T5 (R. 135).  She was to undergo chiropractic adjustment and massage therapy and was advised to remain off work from September 8 through September 23, 1999 (R. 134).

A cervical spine motion study dated October 18, 1999, revealed reversal of the normal cervical lordosis with decreased range of motion in all planes, which may represent myofascial spasm.  There was also decreased rotary motion C5, C6 and C7 on side bending to the right possibly representing disk disease at these levels (R. 111).  The lumbar spine motion study revealed tilt to the left (R. 112).

Plaintiff returned to her chiropractor on November 3, 1999, and it was noted that she was "progressing" with care (R. 130-33).  On December 7, 1999, Plaintiff presented again to her chiropractor, complaining of occasional slight pain in her neck, frequent neck stiffness, occasional slight radicular pain into the left arm, occasional slight thoracic pain, occasional slight low back pain, occasional difficulty in grasping objects, and intermittent numbness and stiffness (R. 129).  By return visit on December 29, 1999, Plaintiff had improved, with reports of all pain and stiffness being slight and occasional (R. 125).  The chiropractor opined that Plaintiff's condition was stabilized and not likely to improve with surgical intervention or medical treatment (R. 124).  The chiropractor opined

that Plaintiff was not likely to suffer sudden or subtle incapacitations, and assessed a 15% whole body impairment from the automobile accident (R. 121).

On February 19, 2000, Plaintiff was seen at Shands Hospital with complaints of an electrical shock while trying to plug in a lamp. Her right 4th finger was discolored and there was itching and discomfort in the right hand and wrist.  She also noted some occasional pain in the right shoulder (R. 145). She was to take ibuprofen for pain, and was referred to her family doctor (R. 144, 140).  Follow up visits for this with her family doctor were unremarkable, with Dr. Parveen noting on February 28, 2000, "whatever burn she had has gone." (R. 185).

Plaintiff was seen by Dr. Parveen on February 28, 2000, with some pain in the heel of the left foot (R. 185).  There was no weakness or numbness but there was pain to bare weight. No significant finding appeared on x-ray or on examination (R. 186).  The assessment was left heel pain of unclear etiology.  She was referred to a podiatrist.

On March 6, 2000, Plaintiff presented to a podiatrist, who assessed her with arthritis of the left foot (R. 157), and instructed her to stay off work until March 13, 2000 (R. 157-160).  On March 14, 2000, Plaintiff called Dr. Parveen's office, seeking referral to a neurologist.

On March 21, 2000, she returned to Dr. Parveen with no improvement in her left foot (R. 183). She also complained of feeling of squeezing in the right arm that could be anywhere like the shoulder or sometimes in the wrist.  Plaintiff reported that this is all happening since she received the electric burn, and she is dealing with an attorney on this (R. 183).  Physical examination was completely unremarkable, and the doctor noted that "[t]here is no physical finding involving the left foot except that she mentions that it is tender when I touch the bottom heel of the left foot." Dr. Parveen obliged Plaintiff's request to be referred to a neurologist.

X-rays of the cervical spine were normal, except for reversal of the cervical curvature (R. 182).

On March 27, 2000, Plaintiff returned to her podiatrist (R. 156).  The diagnosis was neuritis/neuralgia probably secondary to electrical injury.  An MRI of the left foot dated April 7, 2000, revealed a tiny amount of fluid on the undersurface of the tibialis anterior tendon just prior to its insertion on the medial cuneiform and the base of the 1st metatarsal bone (R. 153). There was also a tiny amount of enhancement in that area suggesting inflammation. (R. 153-4).  This was deemed to be of uncertain significance, and the tendon was entirely normal, with no evidence of edema, otherwise abnormal enhancement or stress fracture.  *Id.*

Plaintiff returned to the podiatrist for follow up of her left foot pain on April 13, 2000 (R. 152). The podiatrist felt that the MRI results were unlikely to be correlated to her current symptoms, and referred her to a neurologist.

Plaintiff was evaluated by neurologist Mary Derbenwick, M.D., on May 2, 2000 (R. 179-180). X rays of the lumbar spine were noted to be normal (R. 178). An MRI of the lumbar spine was unremarkable (R. 177).  An EMG/Nerve Conduction Study performed on May 25, 2000, revealed no evidence of peroneal neuropathy; no tarsal tunnel syndrome; no peripheral neuropathy; no median neuropathy; no radial neuropathy; no cervical radiculopathy; no active denervation noted in the left leg or right arm; and no paraspinal abnormalities (R. 175, 162-71).  The study did indicate partial right ulnar nerve dysfunction, and a left L5, S1+/- S2 radiculitis with no evidence of any definite radiculopathy.  *Id.*  Plaintiff's neurologist recommended physical therapy for her left leg, exercises for strengthening the ulnar nerve, and instructed Plaintiff to avoid resting on her right elbow (R. 175). Plaintiff underwent physical therapy and reported improvement in her hand by July 18, 2000 (R. 174).

On July 27, 2000, Plaintiff returned to Dr. Derbenwick, who noted that Plaintiff's EMG showed a right ulnar neuritis and a left L5, S1 radiculitis that is mild (R. 173).  When she walked, she held her left foot very stiffly with the front of the foot elevated, yet she could turn the foot in and out without any problem and could hyperextend it.  She had an absent left ankle jerk.  She was tender over the right ulnar nerve at the elbow and it was recommended that she protect her elbow and not do prolonged activity with it and pace herself.   Dr. Derbenwick recommended vitamin B-6, and instructed Plaintiff to work her left leg and return in six months.

On November 7, 2000, Reginald Bowden, M.D., examined Plaintiff due to complaints of bitemporal headaches that come and go and excessive thirst (R. 194).  Plaintiff reported being under stress but has had no photophobia, nausea, vomiting, weakness, slurred speech or ataxia.  Physical examination was completely normal, with no abnormalities noted.  Assessment was headache, lupus and polyuria.

T. Thiruchelvam, M.D., evaluated Plaintiff on December 20, 2000, at the request of the office of disability (R. 195-198).  Plaintiff complained of right hand pain, left arm pain and left foot pain and a history of generalized muscles and joint pains.  She also reported headaches on and off and generalized headaches for the last 4 days.  Examination of the upper extremity revealed good power and strength, some decreased handgrip on the right to about 3 out of 5, but fine manipulation appeared to be intact.  With the lower extremity, examination revealed "good power and strength" in both extremities, with no focal weakness or wasting.  Her gait was slow and she walked favoring her left leg, very slowly and painfully.  She was able to walk within the room without the cane but had to hold on to the side of the table or the bed.  Exam of the lower extremities revealed good peripheral pulses

and no edema.  Examination of the major joints and hands showed no inflammation or effusion.  She had full range of motion for all her joints, and spine straight leg raise was negative bilaterally.  *Id.*

A CT Scan of the head dated January 10, 2001 was unremarkable (R. 199).

On February 22, 2001, Dr. Bowden completed a questionnaire in which he noted that Plaintiff was prescribed Zoloft to help with her headaches and fibromyalgia since she was unable to afford psychiatric evaluation and no community services were available. It was also noted that he had not referred her to any mental health professional, but felt she needed a complete psychological evaluation if she could afford it (R. 110).

Neurologist Olimpio Cunha, M.D., evaluated Plaintiff on April 13, 2001, for her right hand and left foot symptoms (R. 271-72).  Plaintiff came to the examination accompanied by her next door neighbor's son that she stated she was babysitting.  The doctor noted that examination yielded "limited objective findings due to some lack of effort." (R. 271).  The assessment was right distal upper extremity weakness and left distal lower extremity weakness.  Prior records were ordered, as examination revealed "no obvious cause" for her reported abnormalities. *Id.*

William Friedenberg, Ph.D. completed a psychological evaluation of Plaintiff on April 17, 2001, which consisted only of a clinical interview (R. 200-201).  Plaintiff's affect was mostly euthymic, although she became sad and cried briefly at one point during the interview.  Her manner was somewhat spacey, but cooperative overall.  She reported having suicidal thoughts in the past which continue occasionally.  She reported hearing someone calling her name when no one is there.  She sometimes would have paranoid ideas that people are out to get her and reported some difficulty with her memory for recent events.  Daily activities were reported to include reading, listening to music and Bible tapes, and taking care of three pet dogs.  She walks three days a week for exercise,

socializes with a couple of friends, attends church several times per week, drives a car and shops. Overall memory and concentration were estimated to be significantly impaired.  Judgment was fair. Ability to abstract meaning of proverbs was poor.

On April 19, 2001, a non-examining state agency physician reviewed the record and opined that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; could stand and or walk about 6 hours in an eight hour day and sit for six hours in an eight hour day, with occasional limitations in the ability to push or pull in upper extremities (R. 202-209).

On April 26, 2001, a state agency non-examining psychiatrist reviewed the records and noted that Plaintiff would have moderate restrictions of activities of daily living and in difficulties in maintaining concentration, persistence or pace (R. 220).  She was also moderately limited in the ability to carry out detailed instructions, ability to maintain attention and concentration for extended periods, in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods and the ability to set realistic goals or make plans independently of others (R. 224-25).

On July 6, 2001, Plaintiff underwent a vocational evaluation by Joyce Day, B.A. (R. 236-42). The evaluation revealed that Plaintiff was functioning within the average range of intellectual ability. From a physical standpoint, substantial limitations were observed during testing, including a high pain level on both testing days resulting in low back pain, leg cramps in both feet, with diminished balance and coordination due to pain.  Both hands were reportedly painful and she needed to walk with a cane. She appeared to have limited stamina to perform work activities, to stand/walk for any appreciable length of time and it appeared that she tolerated frustration, followed directions well and would do

-8-

best in a job not requiring decision making and which was somewhat repetitive in nature (R. 236- 42). Based on her reported interests, her abilities and aptitudes, the vocational evaluator recommended a "representative sample of positions" for further consideration, which included companion (light, unskilled), assembler (light, unskilled), answering service operator (sedentary, semi-skilled), and office helper (light, unskilled) (R. 236).

A psychiatric review technique was completed by a state agency non-examining psychologist on July 30, 2001, that indicated that Plaintiff was moderately limited in the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, and in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 243- 58).  This psychologist opined that "overall, given only simple instr to carry out [as in prev work], and some allowances for periodic probs with attn/conc and for possible periodic psychol probs affecting productivity, clmt retains adequate mental ability to carry out simple instr and relate approp to others in a routine work setting." (R. 259).

On August 6, 2001, Plaintiff was seen by Dr. Bowen with complaints of having pain and numbness in the right foot (R. 278).  Examination was unremarkable, with no tenderness in the joints, cyanosis or crepius.  Plaintiff had full range of motion, but nevertheless ambulated with a cane.  The assessment was peripheral neuropathy, right foot pain and history of positive ANA.  Plan was to x-ray the right foot (R. 278).  On August 23, 2001, the foot was x-rayed, and it was unremarkable (R. 277).

Plaintiff presented to her neurologist on September 10, 2001 for follow-up (R. 269-70).  Dr. Cunha summarized the medical tests as including a normal CT head without contrast, normal lumbar

spine x-rays, unremarkable MRI lumbosacral spine, and the EMG which showed "some partial right ulnar nerve dysfunction and apparently some mild radiculitis." (R. 270). On examination, there was no obvious muscle wasting, but there was some diffuse weakness of right upper and lower extremity. The doctor noted, however, that there was a "clear lack of effort therefore it's difficult to appreciate the value of these findings." Reflexes remained present and Plaintiff was able to walk on toes and heel with left lower extremity limp. Plaintiff reported that her symptoms started after her electrical shock. Repeat testing was suggested, as was referral to other neurologists "who work with attorneys, when the issue is accident/injury/litigation." *Id.*

Plaintiff returned to Dr. Bowden on September 19, 2001, with complaints of pain in her hand (R. 276). Her left foot pain persisted and she still had difficulty moving her toes, but examination revealed no tenderness, and Plaintiff was able to flex and extend her toes to get into her shoes. She also complained of right sided chest pain with movement or pressure on her right breast. The assessment was musculoskeletal right breast pain and joint pain. Plan was for ice pack as needed and continue current therapy.

Plaintiff was seen by Dr. Bowden on October 10, 2001, for a well woman examination. with continued complaints of left foot and breast/chest area pain (R. 275). Plaintiff reported that she did not use the ice as instructed because she "forgot." Examination was essentially normal, and assessment was right chest pain and left foot pain. Plan was ice, as needed, and to obtain copies of her neurological records.

On January 28, 2002, Plaintiff presented to Dr. Bowden with no new complaints but with fatigue and pain in her joints, especially her left foot (R. 281). She was still having weakness and ataxia, and reported being occasionally depressed. On examination, Plaintiff stated that her foot hurts

all over.  She had no edema, erythema, full range of motion was present.  The doctor noted: "She is tender everywhere I touch although not when she is distracted." (R. 281).  The assessment was fatigue and left foot pain, and Plaintiff was encouraged to get a second opinion, as her blood tests were normal.

On March 18, 2002, she returned to Dr. Bowden, and reported feeling tired, depressed and having difficulty concentrating, but her joint pain had improved (R. 280).  Examination was unremarkable, with no swelling or tenderness, and neurovascular assessment was intact.  Assessment was fatigue, pain in joints and depression.  Dr. Bowden noted that he encouraged Plaintiff to get a second opinion "since I could not find any other causes for her symptoms and two heads would be better than one."

On May 7, 2002, Plaintiff returned to Dr. Bowden, and reported getting muscle spasms occasionaly in her legs and hand (R. 279).  She appeared more energetic, and the examination was, again, unremarkable.  The assessment was fatigue and depression improved and joint pain slightly improved.  Plaintiff was encouraged to continue doing exercises and take her medication. On return visit June 25, 2002, Plaintiff reported that she still gets cramps, but nowhere near as bad as before (R. 344).

Michael West, Psy.D., completed a psychological evaluation on December 13, 2002 (R. 345-49).  Mental status examination indicated that Plaintiff was alert and oriented, responses were linear and goal directed, and she denied current homicidal ideation, hallucinations or paranoia.  There was no evidence of a formal thought disorder.  Judgment was deemed to be adequate, as was short term memory.  Long term memory was "fine." (R. 346).  Her overall mood was mildly depressed, but affect was appropriate.  Psychological testing was administered, but the results were invalid, due to

-11-

Plaintiff's "haphazard way of completing the examination." (R. 346).  The diagnoses were dysthymia, mood disorder (mild depression) related to her medical condition (R. 346).  Her GAF[2] was 70/70.  Dr. West opined that Plaintiff was experiencing a mild depressive disorder, but "[i]t does not appear that her depression is interfering with her ability to work at this time." (R. 347).  Her ability to understand, remember and carry out complex job instructions was noted to be fair, and her ability to maintain attention and concentration was deemed to be "good." (R. 348-49).

Plaintiff was seen by Dr. Bowden on January 13, 2003, for follow up on right hand pain and left foot pain (R. 374).  Her medicine compliance was noted to be poor.  She returned on March 19, 2003 for follow up of her right hand pain (R. 369).  Her medicine compliance was noted to be good, and she reported that her headaches improved since the last visit.  X-rays of the right hand taken on March 20, 2003 were unremarkable (R. 368).

Plaintiff was seen on April 8, 2003, at the emergency department of Halifax Medical Center with complaints of neck, shoulder and back pain (R. 382-83).  She reported having an electrical shock in 2000 causing peripheral neuropathy in the left leg.  She now had a gait disturbance and uneven gait.  Neurologically there was weakness to the lower extremity as well as deficit from a proprioception standpoint. The diagnosis was myalgias and muscles secondary to biomechanical problems.

On May 15, 2003, Plaintiff underwent a bone density study which was noted to be normal (R. 353).

Plaintiff was seen by Dr. Bowden on June 2, 2003, due to complaints of headaches and joint pain (R. 350).  There was no change in her previous condition.

---

[2]Global Assessment of Functioning scale. A score of 70 indicates mild symptoms.  A score of 50 indicates serious symptoms.

Psychiatrist Lawrence Wylie, M.D., evaluated Plaintiff on July 23, 2003, upon referral of Plaintiff's attorney (R. 389-92).  On mental status examination, Plaintiff "appears in reasonable health" casually dressed with good hygiene (R. 391).  Her attitude was described as "childish and passive." It was noted that she reported her mood as sad and depressed, "but affect is not depressed." She was found to be focused on physical complaints, feeling helpless.  No evidence of hallucinations or delusions was reported, orientation and recall were normal.  Insight was limited; judgment was fair. (R. 391).  Diagnostic impression was dysthymic disorder and pain disorder with psychological factors, and Plaintiff was found to have a GAF of 50 (R. 391-92).  Dr. Wylie concluded that Plaintiff "appeared to have a disabling psychiatric disorder – ie chronic" (R. 392).  Dr. Wylie completed a mental residual functional capacity assessment in which he opined that Plaintiff had marked limitations in the following areas: ability to understand and remember detailed instructions, ability to carry out detailed instructions, ability to maintain attention and concentration for extended periods, ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, ability to interact appropriately with the general public and the ability to set realistic goals or make plans independently of others (R. 385-86).

Plaintiff appeared and testified at both her initial and subsequent hearings, as to her pain and limitations.  At the October 16, 2002 hearing, Plaintiff described her most serious problem that keeps her from working as "I hurt all the time." (R. 489).  She described her daily activities, and noted that she shops and drives.  She does the laundry (R. 493).  She testified to problems with her memory and concentration, but also stated that her husband gives her his paycheck and she pays the bills (R. 509).

-13-

The ALJ found that Plaintiff had impairments of fibromyalgia, right ulnar neuritis, left L5-S1 radiculitis and an affective disorder, but did not have impairments that are severe enough to meet or equal the Listings (R. 18).  The ALJ determined Plaintiff had the residual functional capacity (RFC) to perform a slightly reduced range of light work (R. 25, Finding 7), and found that Plaintiff's capacity for such work is substantially intact, and had not been compromised by any non-exertional limitations. Based on Medical-Vocational Rule 202.20 ("the Grids"), the ALJ determined Plaintiff could perform a significant number of jobs in the national economy (R. 25,  Finding 13). Consequently, Plaintiff was found not disabled.

### THE STANDARD OF REVIEW

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).   The Commissioner's findings of fact are conclusive if supported by substantial evidence.   42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – *i.e.,* the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir.

1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

### ISSUES AND ANALYSIS

Plaintiff asserts that the ALJ erred in finding that Plaintiff could perform other work in the national economy without obtaining evidence from a Vocational Expert.  Implicit in this argument are contentions that the findings of the ALJ with respect to Plaintiff's residual functional capacity are not supported by substantial evidence.  This Court disagrees.

**The Five Step Evaluation**

The ALJ must follow five steps in evaluating a claim of disability.  *See* 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.  29 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520(e).  Fifth, if a claimant's impairments (considering her residual functional capacity, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.  20 C.F.R. § 404.1520(f).  This case was resolved at the fifth step.

**When Vocational Expert Is Necessary**

Once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant court perform other work that exists in the national economy. *Foote v. Chater*, 67 F.3d 1553 (11th Cir. 1995). In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"]. *Foote*, 67 F.3d at 1558. Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00(e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).

Exclusive reliance is not appropriate "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walter v. Bowen*, 826 F.2d 996, 1002-3 (11th Cir. 1987). In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. *Foote*, 67 F.3d at 1559. It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

Here, the ALJ made a specific finding that Plaintiff had a non-exertional limitation of "slight difficulties with concentration" but made an express finding that her ability to perform light work was substantially intact and not compromised by any non-exertional limitations.  Plaintiff contends that this finding is not supported by substantial evidence in that Plaintiff suffered from non-exertional limitations of pain, and depression, as well as fatigue and weakness due to fibromyalgia.  Plaintiff also asserts that the ALJ improperly discredited Plaintiff's credibility based on her daily activities.  The Court is not persuaded.

**Pain**

Pain is a non-exertional impairment.  *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1528.  In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote*, 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

**Credibility**

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence). A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true. *Foote*, 67 F.3d at 1561-62; *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

Here, the ALJ thoroughly set forth the medical evidence regarding Plaintiff's condition and found that her complaints of disabling pain and fatigue were not credible (R. 20). This finding is supported by substantial evidence. The ALJ noted Dr. Tsai's relatively benign examination and treatment recommendations; the chiropractor's conclusions that her condition had stabilized and she was not likely to undergo sudden or subtle incapacitations; Dr. Cunha's mild findings; Dr. Bowden's opinion that Plaintiff was tender everywhere he touched her, except when she was distracted; and noted that Plaintiff required no hospitalizations or surgeries and presented in no acute distress on almost every examination (R. 20-21). All of these findings are amply supported in the record.

Moreover, Plaintiff has not shown how the pain standard was misapplied in this case. Virtually all objective testing was either unremarkable or positive for only mild abnormalities, and two of her treating physicians suggested that she obtain a second opinion, due to the lack of any positive findings to explain her complaints. Although Plaintiff contends that fibromyalgia *could* be the reason for all of the symptoms and complaints she alleges, none of her doctors have so concluded

-18-

and none have found that she was disabled due to functional limitations of that disorder.  Indeed, Plaintiff told her doctors that she believed her symptoms were due to the electrical shock she received.

Additionally, the ALJ noted that Plaintiff's activities of daily living exceeded her claimed functional limitations.  While Plaintiff correctly notes that participation in everyday activities of short duration does not disqualify a claimant from disability, *Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997), the activities undertaken here (Bible study, reading, listening to tapes, taking care of three pet dogs, walking three days a week, socializing with friends, attending church several times a week, driving, shopping, babysitting a neighbor's child, paying the bills) go directly to the issue of Plaintiff's credibility with respect to the claimed functional limitations.  As such, they are properly considered. *See Moore v. Barnhart,* 405 F. 3d 1208 (11th Cir. 2005).

With respect to Plaintiff's allegations of depression, the ALJ evaluated the evidence and concluded that Plaintiff's affective disorder was not significantly limiting (R. 21-22).  This, too, is supported by substantial evidence.  While there are conflicting psychological reports, the ALJ's findings do not have to be supported by *unanimous* evidence, only by substantial evidence.  It is the ALJ's task to weigh the evidence.  See 20 C.F.R. §§ 404.1546, 416.946.  Here, the evidence as to Plaintiff's depressive disorder consists of reports from one time examiners, non-examining state agency psychologists, and the occasional note from Plaintiff's family doctor (Dr. Bowden).  That evidence, summarized above, indicates that Plaintiff had never been hospitalized for psychiatric symptoms or treated on a regular basis by a mental health professional.[3]  She had been prescribed anti-depressants by her family doctor, but Dr. Bowden noted that he prescribed them for her headaches

---

[3]Mike Ludwig, M.A., a mental health counselor, submitted a letter in which he stated that Plaintiff contacted him for counseling on June 30, 2003, but that Plaintiff had attended only one full counseling session, arrived late for a partial session, and had cancelled her other scheduled sessions.  As such, Mr. Ludwig stated that he was not able to offer even an initial assessment of her condition. (R. 393).

and fibromyalgia.  Dr. West opined that Plaintiff had a GAF of 70, and the state agency psychologists did not find marked limitations.  There are no episodes of decompensation noted in the record, and Dr. Bowen's notes indicate that Plaintiff's depression was "occasional" and, by 2002, had improved on medication.  Moreover, Plaintiff's self-reported activities are inconsistent with a finding of disabling mental impairment.  This constitutes substantial evidence to support the finding.

Plaintiff points to Dr. Wylie's report of disabling limitations as grounds for error.  The ALJ, however, discredited Dr. Wylie's opinion, as being inconsistent with his own notes, in which he stated that Plaintiff's affect was not depressed and her recall was normal (R. 21).  While substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise, *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991), Dr. Wylie was not a treating physician, and the inconsistency between his notes of the clinical examination and his conclusion provide good cause to discount the opinion.  *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements.)

Plaintiff also contends that she had manipulative limitations due to her right ulnar neuritis, and, as such, could not perform the fingering and handling demands of light work.  While the ALJ did find that Plaintiff has ulnar neuritis, Plaintiff points to no medical evidence, save for Plaintiff's claims of weakness, to support any such limitation.[4]  No physician has imposed work related restrictions due to this condition and there are no findings that Plaintiff is prohibited from full use of her hand.  This contention is without merit.

---

[4]Indeed, even the subjective claims of weakness were deemed suspect by Plaintiff's neurologist, who twice noted a lack of effort by Plaintiff, in the examination.

Although not raised by the parties, there is another reason that the Court is not persuaded by the Plaintiff's contention that the ALJ should have obtained "evidence of a Vocational Expert."(Doc. No. 14 at 10). Quite simply, the record *includes* such evidence in the form of the detailed vocational evaluation summarized above. That evaluation purports to include an in-depth summary of Plaintiff's aptitudes and abilities, including her physical and mental abilities with respect to a work environment, and makes certain vocational recommendations based on those findings. Notably, the evaluation including a review of Plaintiff's medical records, her subjective reports of pain and limitations, and the results of a two day long evaluation and testing effort. Based on this review, the evaluator identified four jobs which were felt to be within Plaintiff's "interests, abilities and aptitudes." (R. 236). While the ALJ did not discuss this report in his determination, it is part of the record before the ALJ at the time of the determination. Plaintiff does not challenge the conclusions of this report, which are consistent with the ALJ's ultimate conclusion that Plaintiff has the RFC for a substantial range of light work.

### CONCLUSION

The findings of the ALJ are supported by substantial evidence and were made in accordance with the proper legal standards. As such, the determination is **AFFIRMED.** The Clerk is directed to enter judgment accordingly, terminate all pending matters and close the file.

**DONE** and **ORDERED** in Orlando, Florida on August 14, 2006.

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record

-21-